TUTTLE *v.* BRISTOL.

STATUTE OF FRAUDS—INTEREST IN LANDS—CONSTRUCTION OF CON-
TRACT.

> A contract, under which defendant advanced money to pur-
> chase land and timber on which complainant held an option,
> examined, and *held* to contemplate the acquiring by com-
> plainant of an interest in the land and to be therefore unen-
> forceable under the statute of frauds (§ 9509, 3 Comp. Laws)
> because not in writing.

Appeal from Kalkaska; Mayne, J., presiding. Sub-
mitted October 18, 1905. (Docket No. 73.) Decided De-
cember 4, 1905.

Bill by George Tuttle against Bethel Bristol and Wil-
liam H. Bockes to establish an interest in certain land,
and for an accounting. From a decree for complainant,
defendants appeal. Reversed, and bill dismissed.

*Parm C. Gilbert* and *J. L. Boyd,* for complainant.
*Covell & Cross,* for defendants.

BLAIR, J.   The facts of this case and the legal questions
arising therefrom are, in the main, well stated by the
circuit judge in his opinion for a decree, from which we
quote, as follows:

"Complainant held a verbal option upon a parcel of
land principally valuable for the timber thereon, situated
in Kalkaska county.   The consideration in the option
was $4,000, which was later raised to $4,500.

"Complainant was a land and timber looker and the
option was taken to enable him to find a purchaser.   De-
fendant Bristol's attention was first called to these lands
and complainant's option at Traverse City, and by agree-
ment they went to the premises in company with Mr.
Moran and examined the same, with the result that they
concluded the lands were desirable at the price named.

It was agreed between them that defendant Bristol was to advance the sum of $2,000, being all the ready money he then had, and, as Tuttle had no ready money, that the title of the real estate should be taken in the name of the party who should advance the balance of the purchase price, $2,500, and that the land should be sold and the proceeds of the entire purchase price be paid, together with the necessary expense of cutting and removing the timber, if the lands were not sold outright, after which the profits arising from the venture were to be divided equally, share and share alike.

"The testimony is conflicting as to whether Tuttle or Bristol was to obtain the $2,500, but in view of all the testimony and the acts of the parties, I consider it immaterial which party was to take the active part in finding the person who would advance the money. The land was to be deeded to the party who might advance the money, and this amount was first to be paid. As both parties considered the land of considerable more value than the sum of $2,500, and that this sum could be readily met by them by taking off and selling the timber and bark, in case they did not find a purchaser for the land, the question as to who would be personally responsible for the $2,500 did not probably enter very largely into their consideration, at least, I do not consider it a controlling question.

"Bristol advanced the sum of $2,000, as agreed upon, the same being advanced equally for the benefit of Tuttle and himself. He would be, therefore, equally, if not more, interested than Tuttle in finding a person to advance the remainder of the purchase price.

"Later, becoming uneasy, defendant Bristol arranged a meeting with the owners of the land at Kalkaska, without notice to Tuttle, and closed up the deal, defendant Bockes being substituted for complainant, but without the knowledge of Tuttle or of the owners of the land, who made the conveyance to defendant Bockes supposing that Tuttle was the real party in interest with Bristol, and that defendant Bockes was advancing the money as a loan and taking title in his own name as security for the money advanced.

"Defendant Bockes was fully advised as to the rights of the complainant, Tuttle, in the premises. Defendants have taken off and sold certain of the timber from these lands. Complainant contends he has an interest in the profits, if any, arising from the lumbering operations, by

reason of his option and agreement with defendant Bristol, and the subsequent payment of a part of the purchase price by Bristol to the owners and the conveyance by them to Bockes of the land in compliance with the terms of his option, and cites *Petrie* v. *Torrent*, 88 Mich. 43, among other cases.

" Defendants claim the agreement to be for the sale of an interest in lands and within the provisions of the following statutes, and therefore void, viz. :   3 Comp. Laws §§ 8835, 9509.   •

" The facts in *Petrie* v. *Torrent*, 88 Mich. 43, and 100 Mich. 117, are very similar, and the reasons apply with equal force to the case at bar; while the uncontradicted facts that the owners of the premises recognized their option to Tuttle as a subsisting obligation and received the consideration and made conveyance to Bockes as a security, in the interest of Tuttle, understanding and intending to discharge that obligation, and that Tuttle had no knowledge or notice that the conveyance was made until a later date, when he immediately protested against the acts of defendants, furnish additional reasons why the statutes cited do not apply."

We add to the above statement of the facts of this case the following:   The verbal option covered the land and timber of three 40's, but the timber only of three other 40's.   It is apparent, from the opinion above quoted, that the circuit judge regarded the contract between the parties as simply a profit-sharing agreement, not involving any interest in lands.   We do not think the pleadings and proofs sustain such a construction of the agreement.   As bearing upon this question, we quote from the bill of complaint and from complainant's testimony.

Paragraphs 5, 6, 10, 12, 16, 21, and 22 of the bill of complaint, as originally filed, read as follows:

" 5. That Bethel Bristol, one of the defendants herein after named, after learning that your orator had the option aforesaid, informed your orator that he would with your orator's consent become a party thereto with your orator and that in consideration that your orator would permit him to have an interest in said option and in the lands and timber to be procured thereunder on advancing the sum of two thousand dollars ($2,000) as part of the

purchase price of the said lands and timber and that as to the remaining two thousand · five hundred dollars ($2,500) required for the payment of the said purchase price, the said Thomas Moran and John Morrison might deed the said lands and timber to whomsoever would be willing to advance the sum of two thousand five hundred dollars ($2,500) to your orator and the said Bristol, to be held in trust, by the person so advancing the money until such time as your orator and the said Bristol might be able to pay for the same under an arrangement to be made between your orator and the said Bristol and the person so advancing the said money; it being expressly understood that your orator and the said Bristol should become the equitable owners of the said lands and timber and should equally bear in share the cost and expenses of conducting the business of cutting down and taking away the timber therefrom, and after the payment of the costs and expenses so incurred should equally share the profits that arise from the business as well as the money to be received in any way *from the sale of the lands so to be owned by them.*

· "6. And it was expressly understood between your orator and the said Bristol that upon the payment to the party to whom said lands might be deeded of the said sum of two thousand five hundred dollars ($2,500) and that the party so holding the lands should deed the said lands to your orator and the said Bristol.  ·

"10. That the said Thomas Moran and John Morrison did not on or before the 21st day of March, 1902, have any notice to the effect that your orator had in any way relinquished his right to the said lands and timber under the said option.   On the contrary, on information and belief, your orator charges that the said Thomas Moran and John Morrison in all their acting and doings in the premises believed that they were dealing with your orator and that whatever their dealings were with Bethel Bristol and William H. Bockes, that such dealings on their part were intended to be for the benefit of your orator.

"12. And your orator alleges that upon information and belief that only the sum of two thousand dollars ($2,000) was paid by the said Bristol to the said Thomas Moran and John Morrison accepted the same with the belief and understanding that your orator and the said Bethel Bristol were equally entitled to the benefit of the said option and were to become equal equitable co-owners of the said land and timber.

"16. Your orator has required the said Bethel Bristol to enter into a formal agreement in writing that your orator embodying the substance of the agreement made with your orator relative to the said lands upon the said 21st day of March, 1902, but the said Bethel Bristol entirely ignores your orator in the premises, and still insists that your orator has no rights in the matter which he is bound in any way to recognize.

"21. Your orator further shows that he is without remedy except in a court of equity and that the said Bethel Bristol should be decreed to be a co-owner with your orator in the lands and timber aforesaid, and if not decreed to be such owner, then the said Bethel Bristol should be decreed to have parted with his interest in the said lands and timber to the said William H. Bockes, and that your orator should be decreed to be a co-owner of the said lands and timber with the said William H. Bockes.

"22. In consideration of the premises your orator respectfully asks the aid of the court in the premises and prays relief, as follows:

"(a) That upon the filing of this bill of complaint a temporary preliminary writ of injunction issued out of and under the seal of this court to be directed to the said Bethel Bristol and William H. Bockes, and to their agents, servants, and attorneys, commanding them and each of them to desist and refrain from cutting any timber heretofore cut and now lying upon the said lands until the further order of the court, and that upon the final hearing thereof the said writ of injunction should be made perpetual.

"(b) That the said Bethel Bristol be decreed to be a co-owner of the said lands and timber with your orator subject to the right of the said William H. Bockes, to hold the said lands and timber in trust under his said deed of conveyance, or if the court shall hold that the said Bethel Bristol has parted with his interest in the said lands and timber unto the said William H. Bockes, and that your orator be decreed to be a co-owner of the said lands and timber with the said William H. Bockes, subject to the rights of the said Bockes under his said deed of trust, and subject to the repayment to the said Bethel Bristol of all moneys which he may have advanced toward the purchase price of the said lands and timber.

"(c) And that your orator may have such other and further relief in the premises as may be agreeable to equity and good conscience."

The bill of complaint was amended upon the hearing, but we do not deem it important to set out the amendments. The complainant testified, upon cross-examination, as follows:

" *Q.* To whom did you go when you thought about commencing suit in this case?

"*A.* To Mr. Boyd.

" *Q.* Did you tell him what the agreement, the arrangement was in regard to the land and timber?

"*A.* I stated the facts to him.

" *Q.* And you stated them to him as they were and as the contract was?

"*A.* Yes, sir.

" *Q.* And he drafted the bill of complaint in this case?

"*A.* I believe so.

" *Q.* Then you afterwards signed and swore to the bill of complaint setting out the agreement, did you?

"*A.* Yes, sir.

" *Q.* Did you read it over?

"*A.* I think Mr. Boyd read it to me.

" *Q.* So you understood what it was?

"*A.* Yes, sir.

" *Q.* Well, did that bill of complaint at that time express the contract and agreement as you understood it?

"*A.* I believe so.

" *Q.* At that time?

"*A.* Yes, sir.	*	*	*

"(Here counsel read paragraph 6 of the bill.)

" *Q.* Now that was the arrangement, was it?

"*A.* Yes, sir.

" *Q.* That upon payment of the money back to the man from whom it was borrowed, that the land should be deeded to the two of you jointly?

"*A.* Yes, sir.

" *Q.* That is what you understood the agreement to have been now, at this time?

"*A.* Yes, sir.

" *Q.* So you were to have a half interest in the land as well as in the timber?

"*A.* Yes, sir.

" *Q.* That was your understanding of the agreement?

"*A.* Yes, sir.

" *Q.* And that is what you understand now, is it?

"*A.* Yes, sir.

" *Q.* That you were not only to share in the profits aris-
ing from the timber, but you should also own a half inter-
est in the land ?

"*A.* Yes, sir.

" *Q.* Then you understood, did you, that under this
arrangement with Mr. Bristol that you were to buy a half
interest in the land and timber ?

"*A.* No, it was understood that he was to buy it and
put up his money against my time and option.

" *Q.* And that you would have a half interest in the
land and timber ?

"*A.* Yes, sir. * * *

" *Q.* In your bill of complaint you ask that the said
Bethel Bristol be decreed to be a co-owner of said land
and timber with you, subject to the right of said William
Bockes, who holds the land and timber in trust under his
said deed of conveyance, that is what you understood was
the arrangement, was it not? I read from the original
bill.

"*Mr. Gilbert:* Well, that matter has been amended,
and that question is not treating the witness fairly.

"*The Court:* I presume it would have the effect of an
admission anyway; being sworn to, if it has that effect.

"*Mr. Gilbert:* I don't so understand it. It is simply a
matter of pleading and the prayer for relief, not prepared
by the man himself.

"*The Court:* I understand that in the prayer for relief
it could be received as an admission, at least, the same as
if made for a third person.

"*Mr. Gilbert:* I suppose the amendment was made for
some salutary purpose.

"*The Court:* I understand the amendments were made
in this case for the purpose of obtaining different relief from
that first prayed for, and not for the purpose of changing
the facts.

"*Mr. Gilbert:* They do not change the facts, we want
simply the relief the facts would warrant.

"*The Court:* That is true, simply a broadening of the
bill.

"*Q. By Mr. Cross:* Now, I will read you the twenty-
first paragraph of the bill. It has not been amended.
(Reads it.) Did you understand any such thing as that,
witness ?

"*A.* Well, I don't remember seeing that paragraph be-
fore, but then, I think, as far as I am concerned, I have

made it as plain as I could that I was to have a half interest in these lands and timber.

"*Q.* And that as soon as this money was paid back to whoever loaned it, then the lands should be deeded to you as an equal undivided interest ?

"*A.* Yes, sir.

" *The Court:* Did you understand that, from the gross receipts obtained from the sale of the timber, when sold, that there was to be deducted from it $2,500, and the interest on it, whatever that might be, and the balance divided between you, that is, after taking out the other expenses, the profits were to be divided between you ?

"*A.* Yes, sir, divided equally.

" *Q.* Well, did you understand the $2,500 was to be deducted before any profits were to be divided ?

"*A.* Yes, sir, it was understood that the purchase price was to be paid and then, after that, why the profit was to be divided.

" *The Court:* As I understand, then, the entire $4,500, the purchase price, was to be deducted from the gross receipts of the timber as part of the expenses, and the remainder, if any, after that, and the paying of other expenses was to be considered as net profits and divided equally between you ?

"*A.* Yes, sir, it was considered that he was to be credited with $4,500, the amount put into this timber and the profits divided.

" *The Court:* That is all I care to ask.

" *Q.* Now, this agreement between you and Bristol in regard to this was all a verbal agreement ?

"*A.* Yes, sir, no writings at all.

" *Q.* Then you claim that under your arrangement you had just as much interest in that land as Mr. Bristol ?

"*A.* Yes, sir.

" *Q.* That you should own a half interest in it when you got through ?

"*A.* The profits were to be divided.

" *Q.* Well, you were to have the land too, were you, both of you ?

"*A.* Well, that would be part of the profits."

The serious and practically the only question for our consideration is whether the court was correct in his opinion that the facts of this case bring it within the principle of *Petrie* v. *Torrent,* 88 Mich. 43, and 100 Mich.

117, and the additional cases relied upon by complainant's counsel. *Davis* v. *Gerber*, 69 Mich. 246; *Carr* v. *Leavitt*, 54 Mich. 540. In *Carr* v. *Leavitt*, defendant employed the plaintiff as his agent with reference to the purchase and management of certain lands for the defendant, and agreed to pay him for his services in obtaining the lands one-half the profits of a subsequent sale thereof. Mr. Justice COOLEY, giving the opinion of the court, said:

"If the contract the plaintiff relied upon was within the statute, it must have been because it contemplated a purchase and then a sale of certain lands. But the plaintiff was to be neither purchaser nor seller and the contract did not contemplate that in any contingency an interest in the land was to be conveyed to or vested in him."

In *Davis* v. *Gerber*, likewise, the contract did not contemplate that in any contingency an interest in the land was to be conveyed to or vested in the plaintiff, but he was acting as agent for the defendant, who was to pay him for his services by dividing the profits on a subsequent sale of the lands.

In *Petrie* v. *Torrent*, 88 Mich. 43, Mr. Justice LONG, speaking for the court, states the relations of the parties, as follows:

"What are the relations between these parties under the claim made by the bill? The complainant held options upon these properties, under which he had the right to purchase them within a given time, or to find a purchaser therefor. He communicated this fact to the defendant, who agreed to pay one-half the expense to investigate the timber, and, if the investigation was satisfactory, to furnish the money to purchase the entire property. If the purchase was so made, then he agreed to give to the complainant one-third of the net profits resulting therefrom. In consideration of this agreement and undertaking on the part of the defendant, the complainant was to pay one-half of the expense of the investigation of the timber, and, if the investigation proved satisfactory to the defendant, then to give him the opportunity to make the purchase, and to contribute his services in carrying out the transaction. It is alleged that the agreement thus

made was carried out, and the purchase made, but that defendant refuses to account for the profits accruing therefrom. The complainant trusted the whole matter to the defendant. He had looked the scheme over for the purchase of the properties, and believed that there was a large profit in it. He procured from Hannah, Lay & Co. the right to purchase, and let the defendant into the scheme. He worked it up, assisted the defendant to make the purchase, and permitted him to take the whole properties in his own name, in reliance upon his agreement to account to him for one-third of the net profits. From these facts it appears that the defendant accepted the trust, and agreed to carry out the terms and conditions of the agreement."

After quoting from *Carr* v. *Leavitt*, the court say:

"In the present case there is no claim upon the part of the complainant that he was ever to acquire any interest in these lands or properties. The title was to be taken in the name of defendant, and the only interest which the complainant had or claimed to have was the profits arising from their sale. It is true that the lands which the Smith Lumber Company is now lumbering represent, in the hands of defendant, who holds the legal title, a portion of the profits arising from the contract between the parties; but, under the arrangement between them, these lands were to be lumbered, and the profits arising therefrom to be apportioned, one-third to the complainant. The defendant denies that complainant has any interest therein."

In the case before us, it is clear, from the allegations of his bill of complaint and from his own testimony, that the complainant was to have an interest in the lands, which were the subject of the contract, conveyed to him and vested in him. Whatever interest Bristol acquired, complainant was to acquire, and it will hardly be contended that Bristol was not to acquire any interest in lands. The agreement, therefore, was for an interest in lands within the statute of frauds and unenforceable.

A decree will be entered, dismissing the bill of complaint, with costs to defendant.

MCALVAY, GRANT, MONTGOMERY, and HOOKER, JJ., concurred.