## NESTER *v.* SULLIVAN.

STATUTE OF FRAUDS—PARTNERSHIP—PAROL CONTRACT—DEALING IN LANDS.

An oral contract of partnership for the purpose of dealing in lands is void under the statute of frauds.[1]

ON MOTION FOR MODIFICATION OF OPINION AND DECREE.

APPEAL AND ERROR — DETERMINATION OF CAUSE — DISMISSAL WITHOUT PREJUDICE.

Where the legal question presented by a bill has not before been passed upon by this court, and there is much weighty authority for the contention of the complainant, this court, on dismissing the bill, will do so without prejudice to further proceedings on the part of complainant not inconsistent with the decision.

Appeal from Ontonagon; Cooper, J.    Submitted January 9, 1907.    (Docket No. 10.)    Decided March 12, 1907. Motion to modify opinion and decree granted May 18, 1907.

---

[1]As to validity of parol partnership to deal in real estate, see note to *Scheuer* v *Cochem* (Wis.), 4 L. R. A. (N. S.) 427.

Bill by Timothy Nester against Thomas G. Sullivan for a partnership accounting. From a decree for complainant, defendant appeals. Reversed, and bill dismissed.

*Chadbourne & Rees*, for complainant.

*Tarsney & Fitzpatrick*, for defendant.

BLAIR, J. This suit was instituted for the purpose of obtaining an accounting of the interests of complainant and defendant in the assets of a certain alleged partnership, consisting of timber lands in Ontonagon county. The bill of complaint alleges:

"That in the spring of the year 1900 your orator and one Thomas G. Sullivan entered into an oral partnership agreement for the purpose of buying, selling, and dealing in lands and timber in Ontonagon county, Michigan, and elsewhere; that under the terms of said partnership agreement, whenever the said partners deemed the purchase of any tract of land or timber desirable, it became the duty of your orator to locate the owners thereof, and negotiate with them for terms of purchase and obtain options upon said lands, and thereupon it became the duty of said Thomas G. Sullivan to examine or cause said lands to be examined, and to make or cause estimates of the timber thereon to be made, showing the quantity, kinds and quality of such timber, and it became and was the duty of both your orator and said Sullivan to either raise the money required to purchase such lands or to interest other parties in such purchase who might advance the money necessary for that purpose, and give your orator and said Sullivan an interest in said lands for their work and services in looking the lands and procuring the options for purchase; that in and by the terms of said agreement the said Thomas G. Sullivan and your orator were equal partners in said enterprise, *and were to have equal interests in all lands and timber purchased by them or by other parties whom they might interest in such purchase*, and that they were to bear and pay the expenses of said partnership in equal proportions; that said Sullivan and your orator at once entered upon the business for which the partnership was formed, and did a large amount of business in locating, securing options upon, buying and

selling different tracts of land and timber in said county of Ontonagon, during the years 1900, 1901, 1902, and 1903; that the active conduct of the business has not been prosecuted by said partnership since the spring of 1904; that the said partnership has never been dissolved nor its affairs and business settled between the said partners, and no accounting or settlement has ever been had between the members of said partnership with respect to said partnership business, and no books of account of said partship business have ever been kept; that no common fund or capital was ever provided or furnished in said partnership business, but that each of the partners from time to time furnished money for defraying the expenses of the partnership business, for the purchase of land and timber, and the conduct of the business of the partnership."

The lands comprising the assets of the so-called partnership are described generally in the bill, after the specific description thereof, as: (1) The Marquette Silver Land Company lands; (2) the Wilmott Mining Company lands, or the Norton lands; (3) the Potter lands; (4) the Meads lands; (5) the Towar Tax Pool lands. At the time of filing the bill of complaint, the record title to the Marquette Silver Land Company lands, the Norton lands, and the Potter lands stood in the name of defendant, and the controversy between the parties relates to these lands. The Towar Tax Pool lands were admittedly held in trust by Mr. Towar, and the Meads lands were in the name of Arthur Nester, a son of complainant. The prayer for relief contains, among other things, the following:

"That the said Thomas G. Sullivan be decreed to convey to your orator an undivided one-half interest in and to all of the land and timber last above mentioned."

Complainant was sworn as a witness in his own behalf, and gave testimony tending to show:

"That some time early in 1900 the parties "entered into negotiations with several parties concerning the purchase and sale of timber on lands. Our interests were always equal. I mean, we were interested together, share and share alike, in these deals, share and share alike in every deal we were into. * * * That we would do

our best, each one of us, to find tracts of timber and obtain options and get the money the best way we could to carry them, and give our interests to the parties who furnished the money, and we would each have an equal interest in the results.

" *Q.* Anything specifically arranged as to what you should do or what he should do in connection with it?

" *A.* No; no specific arrangement was made as to that. I was perhaps adapted to certain phases of the business better than Mr. Sullivan, and he was adapted to certain other phases much better than I was.

" *Q.* In carrying out the arrangement, what did you each do? That is, whether you took one branch and he another?

"*A.* I generally made arrangements to purchase and sell, and he aided me whenever he could, and he generally took the phase of the examination of the lands to see whether they were profitable or not.

" *Q.* That is, the physical examination?

"*A.* Yes; the physical examination.

" *Q.* Was that true generally in the whole course of dealing in Ontonagon county?

"*A.* Yes; in Ontonagon county, and it was true before. * * * We didn't have enough money to buy the lands that we were examining, and we called in Mr. Mather to furnish some money, and he sent me, I think, $5,000, and I took the title of the lands that this money procured and passed it for his benefit to Mr. Holt, of Grand Rapids.

" *Q.* For Mr. Mather's benefit?

"*A.* Yes; for Mr. Mather's benefit, and the intention and understanding was that he was to have a half and Sullivan and I, we, should have a half.

" *Q.* That is, you were to bunch them together?

"*A.* Yes; organize them into a company. Well, you see, that as it was in the case of the Norton lands, for the time being Mr. Sullivan put the money in and it was felt that the proper title should stand in his name, and the same way with Mr. Mather."

With reference to the Towar Tax Pool lands, a written agreement was entered into between Towar and wife, of the first part, and " Timothy Nester and Thomas G. Sullivan," of the second part:

" That the said parties of the first part do hereby covenant and agree that they will sell and convey, as here-

inafter mentioned, to the said parties of the second part, all those certain pieces or parcels of land in the county of Ontonagon, State of Michigan, described as follows. * * *

" It is further convenanted by and between the parties aforesaid that on the performance of all the conditions to be done and performed at the time and manner above mentioned and specified on the part and behalf of the said parties of the second part, the said parties of the first part shall execute a warranty deed to the said parties of the second part, their heirs, executors and administrators."

Defendant, having obtained some money, paid the sum required by the contract with Towar, and took the title in his own name, but prior to this and prior to the contract with Towar, a declaration of trust had been executed declaring the interests of the parties.

" *Q.* Did you say anything to him about taking the title in his own name ?

" *A.* That was customary with us at all times—that the party furnishing the money would take the title—and Mr. Towar took the title in his own name or as trustee. Most of the time as Towar, trustee, for the purpose of securing the amount of money advanced, and that was agreeable to me. * * *

" *Q.* You have mentioned the arrangements or negotiations with reference to the railroad. What had that to do with you and Mr. Sullivan ?

" *A.* It went in as a part of the general scheme. There had to be a railroad built in there to make the lands very valuable, so we thought a railroad would be a good thing in itself.

" *Q.* I didn't hear that last.

" *A.* I say, we thought the railroad would be a good thing in itself because we got all the steel and fastenings for nothing for 25 years.

" *Q.* How did that come to be a part of your—what were alleged to be a part of the business ?

" *A.* Because it would enhance the value of the lands we already had purchased, and what we intended to purchase.

" *Q.* And whether it was understood and arranged between you and Mr. Sullivan ?

147 MICH.—32.

" *A.* There was an arrangement. We considered that a very important feature of the transaction, to control for that extensive territory the means of taking the timber out. It practically controlled the timber, the taking out of several townships; and also was intended to take out the timber that others owned. Of course, if we couldn't buy it.

" *Q.* Was it a part of this scheme that you and Mr. Sullivan carried on ?

" *A.* Yes; it was a part of it.   *   *   *   .

" *Q.* How about the expenses ?

" *A.* They were paid by both parties. I think Mr. Sullivan paid the most.

" *Q.* What was the understanding between you as to such expenses ?

" *A.* The expenses was to be taken out of the general profit. The purchase price and the expenses was to be taken out of the profit.

" *Q.* And suppose you didn't have any profit ?

" *A.* Well, we never made that characteristic.

" *Q.* What was your understanding as to how the expenses should be shared if you had any ?

" *A.* Our understanding was, frankly, that we were going to have a profit. We never made any calculation of not having one.   *   *   *

" *Q.* When was the first time   *   *   *   that you first knew that Mr. Sullivan denied there being a partnership, or denied your interest in the lands in the bill of complaint ?   *   *   *

" *A.* I think it was some time along in 1904.   *   *   *

" *Q.* Now, was that original entry into this Ontonagon district under the arrangement between you that you were to get share and share alike ?

" *A.* Yes; but we had no money then, and we took in Mr. Powell and Mr. Towar.

" *Q.* You took them in on those particular lands ?

" *A.* Yes; on those particular lands, and they furnished the money or raised it at the bank to pay for these tax titles.

"*Q.* That first transaction, then, was the one which you mentioned in the bill of complaint as the Towar Tax Pool lands ?

"*A.* Yes, sir.   *   *   *   Anything that we did or any title that we took in our general arrangement, and any profits we made we was supposed to divide them. If we

could go in and purchase a tract of land where we could get a quarter of an interest where we thought it was desirable to do it, we, of course, would take half the profits of that quarter, as we did in the Towar Pool and the Meads tract.  *  *  *  The substance is this : We agreed in our talks that if the country was what my previous notes and information of it was that we were to go in there and try and pick up financial assistance at a time neither one of us had any amount of ready money, and the understanding was we were to get financial assistance from whoever we could and divide with them—well, make the best bargain we could.  If we could only save half out of the purchase, why we took a quarter of it, as we did in the Towar Pool, which was the first, and that was the line that we had a general understanding on.  We were together, as I said before.  *  *  *

"*Q.* Now, as to the basis on which you were going in together, I think you already testified to that ?

"*A.* The basis was this :  To do the best we could and cut it in two on the profits.  *  *  *  Our first purchase, to give you a little history of it, our first purchase was in 1900, that was the Towar Pool, and then there was some let up.  We were busy in other fields, and I think it was in 1902, or the latter part of 1901, that I began negotiations with Mr. A. C. Bird, third vice president of the St. Paul Road.

" *Q.* My question was directed as to when the proposition came up between you and Mr. Sullivan about the railroad.

"*A.* Mr. Sullivan and I talked of it many times, the necessity of a railroad into that territory in order to economically pick out the timber.  In fact, we considered that any other course would be unprofitable, and I was on the lookout consequently.  I think I took the first step with Mr. Bird without notifying Mr. Sullivan, as I knew his mind and mine were the same on that point.  *  *  *

" *Q.* So there was no agreement that you should contribute any particular sum of money, nor that he should contribute any particular sum of money to any enterprise, was there ?

"*A.* No; we were simply to go into that territory and do as we really did do—obtain the money when we didn't have it ourselves from others, make the best bargain that we could make to parties advancing the money, and divide equally the results.

" *Q.* What do you mean by the results ?

"*A.* The profits, the interest, whatever we got. Whatever we got, whatever we got, whether it was interest in the lands or interest in the profits, we divided.  *  *  *

"*Q.* What do you say about procuring a deed from Norton to Sullivan ?

"*A.* I say now that I procured a contract from Mr. Norton and sent to Sullivan, but I don't remember now who procured the deed. I don't remember whether I did, or he did. My impression is that he did.

"*Q.* Did you know that the deed was made to Sullivan?

"*A.* Yes, sir.

"*Q.* And you knew it was to be made to him ?

"*A.* Yes, sir; because he was advancing the money.

"*Q.* And you say the same thing of the Towar property ?

"*A.* When we bought the Towar property, neither of us had any money, or, if we did have we—

"*Q.* When the deed from Towar to Sullivan was made—

"*A.* I didn't know anything about it until after it was done.

"*Q.* Did you know that Sullivan was going to pay the money to Towar ?

"*A.* No; Sullivan paid the money very soon after he got the money from the Ross estate.

"*Q.* How soon after ?

"*A.* I don't know, I don't remember.

"*Q.* Did you know that he was going to pay it and take the deed ?

"*A.* Well, I think so, I think I knew he was.    He had funds then, and I expected he would.  *  *  *

"*Q.* Mr. Nester, I am asking at the time this bill was filed did you know these lands were not sold ?

"*A.* Yes; I understood so from the examination I made.

"*Q.* Any of them, either the Norton lands, the Potter lands, or the Towar lands ?

"*A.* It was my understanding.

"*Q.* Now, do you want us to understand here this morning that the arrangement between Mr. Sullivan and you was that anything that he went into you would be into it with him, and anything that you should be into he should be in it ?

"*A.* Yes; that is what I want you to understand.
*  *  *

"*Q*. In this contract with Norton that was shown you this morning, you signed that Thomas G. Sullivan by you as agent. Why did you do that?

"*A*. I did that for the purpose of making a binding contract with Norton; thought of various ways in conducting our deal, and I concluded that was the best way.

"*Q*. There was a large amount of correspondence read into the record here yesterday in relation to lands and matters outside of matters that are involved in this suit. Nothing ever came of any of them, did they?

"*A*. No; I believe not; that is, I don't know; not that I know of. Mr. Sullivan may have done something that I don't know about, but I don't know of anything. * * *

"*Q*. Let me state another proposition to get your understanding of this: Suppose that you had paid with your own money the Taylor lands, where would you have taken the deed?

"*A*. If I had my own money, I would have taken the deed myself.

"*Q*. What interest in that land do you understand Mr. Sullivan would have in that deal?

"*A*. He would have the same as I did?

"*Q*. What was that?

"*A*. One-half of it if I bought it.

"*Q*. One-half of the lands?

"*A*. Yes, sir.

"*Q*. Or one-half of the profits?

"*A*. Half of the land. You might call it profits if you like. These sort of deals was sometimes called profits and sometimes called lands. Now, if I furnished all the money, I would take the title, and I would do exactly with Mr. Sullivan—

"*Q*. When it was sold out, what would you do?

"*A*. Divide the money equally with Mr. Sullivan.

"*Q*. Would you regard that he had anything until the money was divided?

"*A*. Just as much to do about it as I did, excepting that I would take the title for the purpose of securing me for the amount of money advanced."

In his opinion for a decree filed in the case the circuit judge said:

"The sole question now before the court for decision is:

"*First*. Did a verbal partnership agreement exist

between the complainant and the defendant as testified to by the complainant ?

"*Second.* If a parol partnership did so exist, is it within the statute of frauds because it relates to the purchase and sale of real estate and void because not in writing ?

"In the case of *Canton Bridge Co.* v. *City of Eaton Rapids,* 107 Mich. 614, the court says:

"'To determine whether persons are in fact partners we must look at their intention, and this is deducible from their declaration as to their intention, and the agreements that they make regarding the subject-matter.'

"A number of the usual elements of a partnership are missing from the agreement in question. No partnership name was adopted, no common partnership fund created, and no agreement to share losses. I am very reluctant to hold that the testimony of the complainant regarding the nature of the agreement created a partnership between the parties, but I have before me the uncontradicted testimony of complainant that such partnership did in fact exist, and also the admissions and declarations of the defendant himself that such partnership existed. This certainly was a declaration and admission on the part of the defendant that a partnership was intended by the verbal agreement. I conclude, therefore, that a partnership as alleged in the bill of complaint existed between the complainant and the defendant.

"Upon the second question, there is much conflict in the decisions. There appears to be no doubt but that a partnership can, in general, be formed by parol, and that such partnership may hold real estate. It is also clear that partnership property may be proved by parol, and this is true, even though the title to the property stands in the name of only one of the partners.

"The exact question as to whether a parol partnership to deal in real estate is within the statute of frauds, and void, does not appear to have been decided by our Supreme Court. In the case of *Raub* v. *Smith,* 61 Mich. 543, and the case of *Brosnan* v. *McKee,* 63 Mich. 454, cited by and relied upon by defendant, the court in my opinion does not decide this question. In both cases the court held that the parol agreement itself was for the purchase of land, and was within the statute. Both agreements provided for the purchase of a particular description of land, and the purchase thereof was a part of the

consideration of the parol agreement. The question of the legality of the parol partnership to deal in real estate was not decided by the court in either of the cases. *Pulford* v. *Morton*, 62 Mich. 26, is also cited by the defendant as sustaining his contention, but in that case, although the question of the legality of such a partnership was raised, the court expressly held that no partnership was proven, and says:

" ' We need not, therefore, consider whether, if made [speaking of parol partnership], it would justify such a suit as the present under the statute of frauds.'

" It is therefore necessary for me in deciding this question to consider authorities from other States. The supreme court of Wisconsin, in the case of *Seymour* v. *Cushway*, 100 Wis. 580, and in *Bird* v. *Morrison*, 12 Wis. 138, has passed upon the precise question, and has expressly decided that an agreement to form a partnership to deal in lands is within the statute of frauds and void unless in writing. There are some other authorities to the same effect, notably *Smith* v. *Burnham*, 3 Sumner (U. S.), 435. I find, however, that there is another line of authorities holding directly opposite, and that such an agreement is not within the statute of frauds, and need not be in writing. *Williams* v. *Gillies*, 75 N. Y. 201; *Dale* v. *Hamilton*, 5 Hare, 383; *Bates* v. *Babcock*, 95 Cal. 479 (16 L. R. 745).

" In *Bates* v. *Babcock*, supra, speaking of a parol partnership agreement, the court says:

" ' Whether such a partnership can be formed, except by an agreement in writing, has been the subject of conflicting decisions. * * * The great weight of modern authority, however, is in support of the rule that such a partnership may be formed in the same mode as any other, and that its existence may be established by the same character of evidence. * * *

" ' Irrespective of any decision, however, an agreement of this character cannot be said to contravene the provisions of the statute of frauds. It does not contemplate any transfer of land from one party to the other, or the creation of any interest or estate in lands. In one sense the parties to such an agreement may be said to have an interest in the lands that are to be purchased under the agreement—that sense in which the beneficiary under a trust for the sale of real estate, and payment to him of the proceeds of the sale, has an interest in the land—but it is only a pecuniary interest resulting from the sale, and a right to have the land sold, rather than an interest in the land itself. * * *

" ' The settlement of partnership accounts, and the conversion into money of the assets of the partnership, whether real or personal, and their division among the partners, has always been one of the functions of a court of equity, and that court never stops to inquire into the source of the title of such assets, or in whose name they are held.   *   *   * ,

" ' It was not necessary for the plaintiff, in support of these averments, to produce written evidence of the agreement, but the agreement could have been established by his oral testimony; and the court erred in striking out the testimony that he gave in support of the agreement.'

"In *Forster* v. *Hale,* 5 Ves. Jr. 309 (cited in *Bates* v. *Babcock,* supra), where the right to an interest in the leasehold of a colliery, claimed by virtue of a partnership with one of the lessees, was involved, and it was objected that, by permitting parol evidence to establish such interest, an interest in real estate or a declaration of trust would be gained without any writing, in violation of the statute of frauds, the court said:

" ' That is not the question. It is whether there was a partnership. The subject being an agreement for land, the question is whether there was a resulting trust for that partnership by operation of law. The question of partnership must be tried as a fact, and as if there was an issue upon it.   *   *   *   That partnership being established by evidence upon which a partnership may be found, the premises necessary for the purpose of that partnership are by operation of law held for the purposes of that partnership.'

" In view of the foregoing decisions, and of many others cited by counsel, I am of the opinion that the weight of authority is now in favor of sustaining a partnership to deal in real estate, resting upon a parol agreement, and that such agreement is not within the statute of frauds.   I therefore find that the partnership agreement in question in this case is a valid agreement, not within the statute of frauds, and the evidence establishing the same was properly admitted.   A decree will be entered accordingly, and the defendant will proceed to make a partnership accounting."

Conceding, without deciding the point, that the circuit judge was correct in holding that a partnership agreement was established by complainant, the question remains whether such agreement was outside of the statute of frauds.   If each transaction were to be considered by

itself as a separate and distinct transaction and not as one of a series of partnership dealings, there can be no question that under the decisions of this court the agreement would have been within the statute and void. As said by Mr. Chief Justice CAMPBELL, giving the opinion of the court in *Pulford* v. *Morton,* 62 Mich. 25:

" So far as the particular purchase is involved, it would not be possible to make out any interest in it for complainant. Any agreement made by him was by parol entirely, and no act was done by him except the payment of some small sums of money, for which, if made with authority, he has a legal remedy. Moreover, by the deliberate and voluntary act of complainant, the title was placed in Robert Morton, with nothing but a verbal understanding how he should hold it. Our statute expressly declares that, under such circumstances, there can be no resulting trust. 2 How. Stat. §§ 5569, 5571, and notes. No other trust could exist without a written agreement; and, on this theory, the testimony is quite as conflicting as upon the other."

The case of *Tuttle* v. *Bristol,* 142 Mich. 148, is very similar to the case at bar, except in this one respect: That it relates to a single transaction, and there was no claim of a partnership. In that case it was held, in substance, that a verbal contract between complainant and defendant—whereby the latter was to advance money towards the purchase of land on which the former held an option, and a third person was to be procured to advance the balance of the purchase price and to take title until complainant and defendant should be able to pay for the land, at which time title was to be deeded to them, it being understood that until that time they should be the equitable owners of the land purchased and the timber thereon, and should equally bear the expense and share the profits of cutting the timber and the money to be received from the sale of the land, it thus being contemplated that complainant should have an interest in the land itself—was an agreement for an interest in land within the statute of frauds (3 Comp. Laws, § 9509), providing that no interest

in lands shall be created except by deed or conveyance in writing, and could not be enforced by complainant against defendant.

In the case before us, as in the case cited, the agreement did contemplate, according to the testimony of complainant, that each of the parties should have an equal interest in the lands purchased. The contract with Towar indicates clearly the understanding of the parties as to their respective interests in the subject-matter of the partnership, and by that contract the lands were to be deeded to them by Towar as tenants in common. The case, therefore, is within the statute of frauds, unless the fact that it was contemplated, and there actually were several transactions, instead of one under a general partnership agreement to deal in lands, differentiates the cases. This case must be determined upon the theory, in my opinion, that the rights of the parties flow entirely from the oral agreement. There has been no other or different part performance of the contract in this case than existed in the case of *Tuttle* v. *Bristol*, 142 Mich. 148. The property was not purchased with partnership funds. It was not used in the partnership business. It was not a mere incident to the partnership; nor did it fall within any of the classes which have influenced the decision of this court in holding that the statute of frauds did not apply. See *Merritt* v. *Dickey*, 38 Mich. 41; *Way* v. *Stebbins*, 47 Mich. 299; *Williams* v. *Shelden*, 61 Mich. 311; *Petrie* v. *Torrent*, 88 Mich. 43, 100 Mich. 117; *Davis* v. *Gerber*, 69 Mich. 246; *Lindsay* v. *Race*, 103 Mich. 28; *Dunlap* v. *Byers*, 110 Mich. 109; *Winans* v. *Winans' Estate*, 99 Mich. 74; *Bennett* v. *Hough*, 141 Mich. 162.

The bald question, then, is presented whether this contract of its own force affords any protection to the complainant. It is true that the weight of authority is in favor of the doctrine that such contracts are outside of the statute of frauds, if the weight of authority is to be determined by the numerical majority of the cases. It is worthy of note, however, that in *Williams* v. *Gillies*,

75 N. Y. 201, cited by the court in support of the doctrine, the court expressly declined to approve it, saying:

" To sustain this judgment requires the adoption of several propositions, all of which I find it difficult to approve. An existing partnership may purchase real estate with partnership funds, and for partnership purposes, and it is immaterial in whose name the title is. It is regarded in equity as between the partners and creditors as personal estate. A trust results from the payment of the consideration with partnership funds in favor of the firm. It is also well settled that a partnership may exist for the purpose of dealing in real estate, and there is considerable authority, and perhaps a preponderating weight of authority, that such agreements may be proved by parol, without violating the statute of frauds. The tendency of the decisions in this State is in that direction, *although the point has never been definitely settled by this court in a case where the question was necessary to the decision.*

" I shall assume the validity of the parol agreement in this case, but, in doing so, it is not intended to affirm the proposition unqualifiedly that every parol agreement between two persons to purchase a specific parcel of real estate, and pay for the same from their individual means, and take the deed in the name of one, although with a view of selling at a profit, is valid and binding upon the ground that it constitutes a partnership in any commercial sense, and is therefore not violative of the statute of frauds. In some of the cases where this doctrine is held there were other circumstances which obviated the objection, and there are respectable authorities against the doctrine."

If the question of the weight of authority is to be determined by the persuasiveness of the reasoning upon which the decisions depend, which must be conceded to be the case in considering the decisions of the courts of our sister States, then, in my opinion, it should be held that the agreement falls within the two sections of the statute of frauds referred to in *Pulford* v. *Morton*, supra. The reasoning influencing my mind in arriving at this conclusion is so ably and elaborately set forth in *Smith* v. *Burnham*, 3 Sumner (U. S.), 435, and *Bird* v.

*Morrison,* 12 Wis. 138, that I content myself with a reference to those cases. In the case of *Dale* v. *Hamilton,* 5 Hare, 369, quoted and criticised by the court in *Bird* v. *Morrison,* supra, the vice chancellor, sustaining the doctrine contended for by complainant, upon what he considered the ground of compelling authority, said:

" When the proposition was first advanced by the plaintiff, I confess it appeared to me that to admit the agreement to the extent contended for would virtually be to repeal the statute of frauds or nearly so; for, if a party by alleging an interest in land of any specific kind can escape from that safeguard against fraud and perjury which the statute has provided, it remains only that those who are prepared by fraud and perjury to invade the rights of another shall make that specific interest (to which it is said the act does not extend) the ground of their claim and the statute is at once evaded. Thus, if A. alleges that B. agreed to give him an interest in land, the statute applies; but, if he adds the land was to be improved and resold at their joint risk, for profit and loss, * * * the statute does not apply."

There is no authority in this State which compels us to virtually repeal the statute of frauds, as I, agreeing in that respect with the vice chancellor, think we should be obliged to do if we sustained the decree in this case.

It results that the bill must be dismissed, with costs of both courts to defendant.

McAlvay, C. J., and Grant, Montgomery, and Ostrander, JJ., concurred.

ON MOTION TO MODIFY OPINION AND DECREE.

*Humphrey & Grant,* for the motion.

*Tarsney & Fitzpatrick,* opposed.

Per Curiam. Motion to modify opinion and decree so as to provide that the bill of complaint be dismissed without prejudice. The legal question presented in this case had not theretofore been directly passed upon by this court. There was much weighty authority in favor of

the complainant's contention, which was adopted by the learned circuit judge as determining the law of the case.

We are therefore of the opinion that the opinion and decree should be modified so as to provide that the bill of complaint be dismissed without prejudice to further proceedings on the part of complainant not inconsistent with our decision.